## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
## HAMMOND DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff, | ) ) ) | |
| v. | ) ) | CAUSE NO.: 2:19-CR-40-PPS-JPK |
| DEVON GIBSON,<br>Defendant. | ) ) ) | |

### OPINION AND ORDER

This matter is before the Court on the United States of America's oral motion to detain Defendant Devon Gibson. While the appropriate legal standards are unsettled and there are facts weighing in both directions, the Court concludes that the government has failed to meet its burden of proof on the current record. After a brief summary of the hearings in this case, the Court will turn to a discussion of the legal standards this Court finds applicable before moving to an analysis of the factors that apply to all detention hearings.

On April 17, 2019, Gibson was charged with three counts of bank fraud in violation of 18 U.S.C. § 1344(1) and one count of aggravated identity theft in violation of 18 U.S.C. § 1028A(a)(1). Gibson was arrested on May 15, 2019, and his initial appearance was held the same day. The government moved for detention on the grounds Gibson is a serious flight risk under 18 U.S.C. § 3142(f)(2) and noted that pending review of Gibson's prior criminal history, it would consider also moving under § 3142(f)(1)(D). As discussed below, resolving how the government may meet its burden of proof under subsection (f)(1) versus subsection (f)(2) is necessary to rule on the detention motion. At the government's request, the Court continued the detention hearing to May 17, 2019.

At the May 17, 2019 hearing, the government confirmed it was moving forward with its detention motion solely on the ground that Gibson is a serious flight risk under § 3142(f)(2)(A). The government also highlighted the § 3142(g)(4) factor of danger to the community. The United States Probation Officer recommended detention due to the fact that there were no conditions or combination of conditions that would reasonably assure the safety of the community or Gibson's appearance. The Court considered argument, heard proffered evidence and stated, "if this were the typical case where [it] was looking at both danger to the community and risk of flight, this would be very easy; you would be remanded to the custody of the marshal." (Hr'g Tr. vol. 1, 17:10-13, ECF No. 17).

Gibson requested a continuance of the detention hearing to allow for a home visit to determine eligibility for electronic monitoring. After the home visit, the United States Probation Officer's ultimate recommendation for Gibson's detention remained.[1] The detention hearing was continued to May 23, 2019, at which time counsel were provided with the opportunity to address legal issues and make additional arguments. The Court indicated that it found the government had not met its burden regarding detention. Gibson was not released after the May 23, 2019 hearing, but the Court indicated how it intended to proceed, set forth conditions it found appropriate, and noted that the government would have a chance to suggest additional conditions.[2]

---

[1] The United States Probation Officer prepared a thorough report and promptly completed a home visit. The report, subsequent memorandum, and clarifying testimony were very helpful to the Court. As noted during the detention hearing, however, courts consider different statutory factors than United States Probation Officers do when making a decision regarding detention.

[2] The government took this as an order of release and sought review under 18 U.S.C. § 3145. That filing is not part of the record for purposes of this decision. Because the request for review was attached as an exhibit to a motion to seal, the first few pages of the motion for review were seen by the undersigned magistrate judge. Though the Court considered requiring written submissions on issues not fully explored by the parties prior to releasing Gibson on conditions, to do so at this time would unduly encroach on time that could by used for review under § 3145.

The hearing was continued to May 28, 2019, for the Court to hear from a potential third party custodian and, assuming issues were resolved regarding conditions of release, the issuance of an order setting conditions of release. The government asked that the Court hold its order of release in abeyance. The Court indicated that it would hear further argument on that issue at the May 28, 2019 hearing.

Prior to a final release order, a United States Probation Officer testified at the May 28, 2019 hearing and clarified that an earlier recommendation, which was silent as to Gibson's risk of nonappearance, was not intended to suggest that such grounds no longer justified detention. The Court indicated that this change was relevant to its earlier determination. Both parties were given an opportunity to question the United States Probation Officer and offer any additional evidence or argument. The government initially declined to do so, but did examine the United States Probation Officer after Gibson's counsel.

After reviewing the matter further, and considering the additional testimony and argument presented on May 28, 2019, the Court issued an order setting conditions of release. The Court again found that the government failed to meet its burden of proof and imposed a number of very strict conditions of release. While Gibson earlier requested only location monitoring with a curfew, the Court ultimately determined that home detention, with location monitoring, was appropriate. Gibson's mother was questioned and will serve as a third party custodian, a task she has not undertaken in past instances where Gibson failed to appear in court. To alleviate concerns related to the potential for ongoing criminal activity, the only device capable of receiving any internet connection in Gibson's home is limited to his mother's cell phone, which is to remain in her custody at all times. Finally, Gibson's mother was not merely named a third party custodian. She also agreed to serve as a surety along with Gibson. They stand to lose $20,000, an amount that

would impose significant economic hardship should Gibson violate the terms of his release or fail to appear. As discussed below, the government's case was not without some compelling evidence. However, it seemed to rest on the notion that the defendant was simply "ineligible" for conditions without carefully considering whether it met its burden of proof that no conditions were capable of reasonably assuring Gibson's appearance as required.

## I.    Standards for Pretrial Detention

Bail pending trial has long been a part of this nation's criminal procedure. The Eighth Amendment to the Constitution of the United States prohibits excessive bail. The First Congress enacted the Judiciary Act of 1789, providing that "upon all arrests in criminal cases, bail shall be admitted, except where the punishment may be death," in which case bail was only permitted in certain circumstances. Judiciary Act, § 33, 1 Stat. 73, 91 (1789). Somewhat more recently, a 1966 law dictated pre-trial release in non-capital cases "unless the [judicial] officer determines, in the exercise of his discretion, that such a release will not reasonably assure the appearance of the person as required." Bail Reform Act, Pub. L. No. 89-465, § 3146(a) 80 Stat. 214, 214 (1966). Detailed review of this history is for another day. In short, while constitutional and statutory principles have limited bail determinations, courts always retained the power to assure the appearance of a criminal defendant and guarantee the administration of justice. The current statutory framework is the Bail Reform Act of 1984 ("Bail Reform Act").[3] Under the Bail Reform Act, judicial officers are often called upon to determine whether a defendant is a flight risk *or* a danger to the community. 18 U.S.C. § 3142, *et seq.* In some ways, this "mark[ed] a radical departure from former federal bail policy. Prior to the 1984 Act, consideration of a defendant's

---

[3] The Bail Reform Act was later amended.

dangerousness in a pretrial release decision was permitted only in capital cases." *United States v. Himler*, 797 F.2d 156, 158 (3d Cir. 1986).

In *United States v. Salerno*, the Supreme Court upheld the Bail Reform Act. Against this backdrop of a statutory scheme that prior to the Act allowed for pretrial detention based upon a defendant's risk of flight, the Supreme Court found the Act did not violate constitutional principles, noting:

> The Bail Reform Act carefully limits the circumstances under which detention may be sought *to the most serious of crimes. See* 18 U.S.C. § 3142(f) (detention hearings available if case involves crimes of violence, offenses for which the sentence is life imprisonment or death, serious drug offenses, or certain repeat offenders).

*United States v. Salerno*, 481 U.S. 739, 747 (1987) (emphasis added).

The legislative history of the Bail Reform Act, *Salerno*, numerous other cases, and common sense dictate that the government cannot fulfill its duty to protect the public without the ability to detain those arrested for the most dangerous crimes when that is the only way to ensure the safety of the community pending trial. *Salerno*, 481 U.S. at 749 ("The government's interest in preventing crime by arrestees is both legitimate and compelling."); *Cf. ODonnell v. Harris Cty., Tex.*, 251 F. Supp. 3d 1052, 1075 (S.D. Tex. 2017) ("Congress wanted to address the alarming problem of crimes committed by persons on release and to give the courts adequate authority to make release decisions that give appropriate recognition to the danger a person may pose to others if released." (internal quotation marks omitted)). Individuals have a "strong interest in liberty," but this interest "may, in circumstances where the government's interest is sufficiently weighty, be subordinated to the greater needs of society." *Salerno*, 481 U.S. at 750-51. This balancing of liberty interests versus public safety led to a narrowly crafted set of conditions under which detention is permitted. Pretrial detention can impact a defendant's ability to prepare a defense, is costly, and while not intended as punishment nonetheless cabins a defendant's freedom, imposing a hardship

on both the defendant and the defendant's family. *See Barker v. Wingo*, 407 U.S. 514, 532-33 (1972); *Schultz v. State*, 330 F. Supp. 3d 1344, 1374-75 (N.D. Ala. 2018), *appeal docketed*, No. 18-13898 (11th Cir. Sept. 13, 2018).

Under the Bail Reform Act, courts "shall hold" detention hearings in two instances. The first instance is when the case involves any one of the enumerated serious offenses outlined in § 3142(f)(1), so called "(f)(1)" cases involving allegations of particularly dangerous criminal activity. The second instance is when one of the "serious" concerns about risk of flight or obstruction of justice are present, the so called "(f)(2)" cases. 18 U.S.C. § 3142(f)(2). Once one of these conditions is met, a hearing is held "to determine whether any condition or combination of conditions . . . will reasonably assure the appearance of such person as required and the safety of any other person and the community." *Id.* § 3142(f). That is, there can be no detention hearing— and therefore no detention—unless an (f)(1) or (f)(2) criterion is met.

Even then, detention is only proper where, after a hearing, "the judicial officer finds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." *Id.* § 3142(e). Here, while the government has moved to detain Gibson only because the (f)(2) predicate of serious risk of flight was met, the government also argues for Gibson's detention because he is a danger to the community. The law is unclear regarding whether a judge may detain a defendant in such a case solely because the defendant is such a danger to the community that no conditions can reasonably assure public safety. That is, after holding a detention hearing on the basis that the defendant is a serious risk of flight, if a judge is convinced that the government has not met its burden of showing that there is no condition or combination of conditions that can reasonably assure the defendant's appearance as required, is that the end of the analysis, or is the judge to move on to consider danger

to the community as the sole reason to detain the defendant pending trial?[4] The Court's limited review of cases suggests this is an unresolved issue. *See U.S. v. Parahams*, 3:13-CR-005-JD, 2013 WL 683494, at *3 (N.D. Ind. Feb. 25, 2013) (noting the issue but not resolving it because detention was warranted on other grounds). Two interpretations of the Bail Reform Act, which the Court will call the *Holmes* and the *Himler* interpretations after *United States v. Holmes*, 438 F. Supp. 2d 1340 (S.D. Fla. 2005) and *United States v. Himler*, 797 F.2d 156 (3d Cir. 1986), respectively, answer this question differently.

### A.  The *Holmes* Interpretation

The *Holmes* interpretation finds that subsection (f) provides criteria that serve only as prerequisites for holding a detention hearing.  438 F. Supp. 2d 1340. In this view, once a prerequisite is met, a court holds a detention hearing and may consider danger regardless of the (f) criterion under which the hearing is held. For example, the government could move for detention based on a serious risk of flight. After a hearing, the court could subsequently find that there are conditions that can reasonably assure the defendant's appearance, but also find that detention is warranted because the defendant presents a danger to the community such that no condition or combination of conditions of release could reasonably assure the safety of the community.

This approach finds some support in the text of the Bail Reform Act. The language in subsection (f) directing a court to determine "whether any condition or combination of conditions . . . will reasonably assure . . . the safety of . . . the community" is found before the division into (f)(1) and (f)(2). *Id.* § 3142(f). Taking the approach in *Holmes*, one could argue that a plain reading of the statute directs courts to consider the safety of the community in cases where there is a serious risk that the defendant will flee—the criterion found in (f)(2)(A). Subsection (g) reinforces this

---

[4] The judge may always consider danger to the community in setting the *conditions of release* under § 3142(c).

reading by providing that courts should consider "the nature and seriousness of the danger to any person or the community that would be posed by the person's release." *Id.* § 3142(g)(4). Section (e) similarly provides,

> If, after a hearing pursuant to the provisions of subsection (f) of this section, the judicial officer finds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community, such judicial officer shall order the detention of the person before trial.

*Id.* § 3142(e)(1).

A court following the *Holmes* interpretation could point out that Congress indicated three times—in subsections (e), (f), and (g) of section 3142—that a court, when determining whether to detain an individual, should consider the danger that the defendant poses to the community. *See* 438 F. Supp. 2d at 1351 ("[T]his Court concludes that dangerousness as a grounds for detention is not excluded in cases involving detention hearing(s) brought under (f)(2)."); *see also U.S. v. Ritter*, 2:08PO00031-53, 2008 WL 345832, at *2 (W.D. Va. Feb. 6, 2008) ("I am of the opinion that the plain language of the Bail Reform Act authorizes the court to detain a defendant when the clear and convincing evidence shows that the defendant presents a danger to the community and the court finds that there are no conditions or combination of conditions which the court may impose upon the defendant which will protect the community."). While the government did not significantly develop this argument as to Gibson, its rough outline can be seen since the government moved for detention on the sole basis that there is a serious risk that Gibson will flee (an (f)(2) criterion) and also referenced the subsection (g) factor of danger to the community.

## B.    The *Himler* Interpretation

Another line of cases finds that courts may not consider dangerousness as a factor weighing in favor of detention when a motion for detention is made only under 18 U.S.C. § 3142(f)(2). As with the *Holmes* interpretation, this reading is based on a reading of the text of the Bail Reform

Act. Moreover, as the Third Circuit Court of Appeals recognized in *Himler*,[5] to do otherwise fails to recognize the Bail Reform Act is a narrowly-drafted statute aimed at danger from "a small but identifiable group of particularly dangerous defendants." 797 F.2d 156, 160 (3d Cir. 1986) (citing S. Rep. No. 98-225, at 6-7 (1983)) (finding that danger to the community should not be considered as a ground for detention under 18 U.S.C. § 3142(f)(2)).

Support for this reading is summarized in *United States v. Chavez-Rivas*, 536 F. Supp. 2d 962 (E.D. Wisc. 2008). *Chavez-Rivas*[6] found squarely that since the government's motion was brought on (f)(2) grounds, the defendant could not be detained as a danger to the community. *Id.* at 968-69. The *Chavez-Rivas* analysis noted that the Bail Reform Act authorizes detention only in seven specific circumstances, enumerated in the statute. *Id.* at 965-66. While these circumstances include "a serious risk that the defendant will flee," they do not include a general showing of danger to any person or to the community. *Id.* at 966 (citing 18 U.S.C. § 3142(f)(2)(A)). The *Chavez-Rivas* court found support for this conclusion in *United States v. Byrd*, which stated that "even after a hearing, detention can be ordered only in certain designated and limited circumstances, irrespective of whether the defendant's release may jeopardize public safety." *United States v. Byrd*, 969 F.2d 106, 109-10 (5th Cir. 1992); *Chavez-Rivas*, 536 F. Supp. 2d at 966. The *Byrd* court further held that, in agreement with *Himler* and the First Circuit Court of Appeals in *United States v. Ploof*, 851 F.2d 7 (1988), "a defendant's threat to the safety of other persons or to the community, standing alone, will not justify pre-trial detention." 969 F.2d at 110.

This Court places less weight on *Byrd*, however, because it did not squarely involve the application of (f)(2)(A). Instead, *Byrd* is one of many cases holding that the government cannot

---

[5] *Himler* reversed an order of detention in a case involving the production of false identification cards that proceeded to a detention hearing on only the (f)(2) ground the defendant was serious risk of flight.

[6] The facts of *Chavez-Rivas* involved immigration issues that are not present in this case.

simply move for detention based on a danger to the community without reference to any of the prerequisites set forth in (f)(1) or (f)(2). Here, in contrast, the government moved to detain Gibson under (f)(2)(A).

## C.   The Court Follows *Himler*

While cognizant of conflicting cases on the issue, this Court finds that detention motions under (f)(2)(A) cannot result in a detention order solely on ground of danger to the community. The *Himler* interpretation, like the *Holmes* interpretation, is well supported through a plain reading of the statute. Condensed as necessary for purposes of this analysis, the Bail Reform Act states:

> **(f) Detention hearing.**--The judicial officer shall hold a hearing to determine whether any condition or combination of conditions set forth in subsection (c) of this section will reasonably assure the appearance of such person as required and the safety of any other person and the community--
>
> > **(1)** upon motion of the attorney for the Government, in a case that involves—[specifically enumerated crimes, all of which have elements that can be seen to cause a significant danger to the community, or closely related factors, such as the presence of a firearm]
> >
> > **(2)** upon motion of the attorney for the Government or upon the judicial officer's own motion, in a case that involves--
> >
> > > **(A)** a serious risk that such person will flee; or
> > >
> > > **(B)** a serious risk that such person will obstruct or attempt to obstruct justice, or threaten, injure, or intimidate, or attempt to threaten, injure, or intimidate, a prospective witness or juror.
> >
> > . . .
>
> **(g) Factors to be considered.**--The judicial officer shall, in determining whether there are conditions of release that will reasonably assure the appearance of the person as required and the safety of any other person and the community, take into account the available information concerning [enumerated factors].

18 U.S.C. § 3142.

Before dividing into subsections, (f) states that the court should determine whether "the appearance of [the defendant]" and "the safety of any other person and the community" can be

reasonably assured by any condition or combination of conditions of release. Subsection (f)(1) provides that, if the case involves a listed type of offense, the government may move for detention. It is easy to apply *both* the appearance and safety mandates of (f) to (f)(1) because the (f)(1) criteria do not place limits on either mandate. Subsection (f)(1) lists a number of situations where a defendant would normally pose both a danger to the community and risk of nonappearance. However, the same does not hold true for subsection (f)(2), which lists both "(A) a serious risk that such person will flee; or (B) a serious risk that such person will obstruct or attempt to obstruct justice, or threaten, injure, or intimidate, or attempt to threaten, injure, or intimidate, a prospective witness or juror."

The "safety to the community" mandate applies to subsection (f)(2)(B) in the sense that the serious risks contemplated by subsection (f)(2)(B) can pose a danger to another person or the community. Attempts to injure or intimidate a witness certainly threaten the safety of a person. On the other hand, there is no rationale supporting the application of the safety to the community mandate to (f)(2)(A)'s language. The specific clause "serious risk of flight" controls over the general inquiry into both risk of flight and danger to the community, especially since the (f)(2)(A) criterion appears merely to restate the historic ground for detention that existed prior to the 1984 enactment of the Bail Reform Act, which did not allow for a consideration of danger to the community.

The Court is faced with competing readings of the Bail Reform Act. One may argue that the reading should simply apply the introductory language in (f) to the entirety of (f)(1) and (f)(2). After all, the judge is to determine whether they can "reasonably assure" both safety of the community *and* the continued appearance of the defendant, and the presence of an (f) criterion

only means that the court moves on to a hearing under (g). That is, the (f) criterion does not itself resolve the question of detention.

However, following this interpretation would prove too much. The *Holmes* interpretation runs into the very problem *Salerno* indicated was *not* present in the Bail Reform Act. That is, this broad reading of the Bail Reform Act has the potential to apply the Act to a nearly limitless range of cases, thereby raising constitutional concerns under the Due Process Clause of the Fifth Amendment and the Eighth Amendment's ban on excessive bail.[7] *Salerno*, 481 U.S. at 750 ("The Act operates only on individuals who have been arrested for a specific category of extremely serious offenses. Congress specifically found that these individuals are far more likely to be responsible for dangerous acts in the community after arrest."). Any reading of the Bail Reform Act that allows danger to the community as the sole ground for detaining a defendant where detention was moved for only under (f)(2)(A) runs the risk of undercutting one of the rationales that led the *Salerno* Court to uphold the statute as constitutional. Because of this potential constitutional issue and because the *Himler* interpretation is another plain language interpretation of the Bail Reform Act that involves no such constitutional issue, the Court will not follow the *Holmes* interpretation. "[W]hen deciding which of two plausible statutory constructions to adopt, a court must consider the necessary consequences of its choice. If one of them would raise a multitude of constitutional problems, the other should prevail." *Clark v. Martinez*, 543 U.S. 371,

---

[7] This is not the sole reason for *Salerno*'s holding, and the Bail Reform Act may well survive a constitutional challenge under the broader reading of the act set forth above.

380-81 (2005).[8] Moreover, the Court does find that the *Himler* line of cases reads the statute in a more natural manner.

The Bail Reform Act could be rewritten to make these issues clear, but on the record before the Court, the Court will not detain Gibson solely on grounds related to community safety. The Court is mindful that while this reading of the Bail Reform Act avoids constitutional concerns, it also has a very real possibility of increasing danger to the community compared to the *Holmes* interpretation. Perhaps that is bad public policy. Perhaps society should weigh the liberty interests of those awaiting trial in a different manner. Nevertheless, as currently drafted, the Bail Reform Act does not mandate a contrary outcome. Given the text of the Bail Reform Act and the analysis above, it is not for this Court to weigh those significant liberty interests against the important duty of the government to ensure public safety, and that is certainly not something for the Court to take up on the current record.

For these reasons, the Court will not consider the danger Gibson poses to the community because consideration of dangerousness is improper where, as is the case here, the sole ground for detention is 18 U.S.C. § 1342(f)(2)(A). The controlling questions, therefore, become whether Gibson is a serious risk of flight and, if so, whether the government has met its burden in establishing that there is no condition or combination of conditions that will reasonably assure his appearance as required.

---

[8] At least one court has also endorsed this reading of the Bail Reform Act on the grounds that subsequent modifications of the act did not suggest a rule contrary to *Himler* and "reaffirm[ed] the validity of *Byrd's* reasoning." *United States v. Giordano*, 370 F. Supp. 2d 1256, 1262 (S.D. Fla. 2005). As discussed, this Court does not find *Byrd* controlling, but the analogous argument applies here that Congress's imputed knowledge of *Himler* did not lead to any amendment of the Bail Reform Act that rejects the *Himler* interpretation.

## II. Serious Risk of Flight

The Court first determines whether Gibson presents a serious risk of flight. The record shows that the government did not move for detention due to "serious risk of flight" as any type of end run around subsection (f) of the Bail Reform Act. There is an ample good faith basis to move for detention under this standard. Though the government and Gibson disagree on the number of "bad faith" failures to appear, they agree Gibson failed to appear in court as required on multiple occasions, and the Pretrial Services Report supports the finding of multiple failures to appear. Even more alarming, Gibson reportedly fled from law enforcement on multiple occasions.

Specifically, the Pretrial Services Report lists multiple failures to appear, though none of the failures were in federal proceedings. Gibson presented explanations for many of these failures, but he concedes that for five of the failures to appear he has no explanation to proffer. The Pretrial Services Report further indicates that Gibson has twice fled law enforcement after attempted traffic stops, once traveling in excess of 100 miles per hour through three counties. During this encounter, Gibson reportedly attempted to strike an Indiana State Police trooper who was attempting to deploy stop sticks. Gibson was arrested and charged with a number of crimes, including resisting law enforcement and reckless driving. The second time Gibson fled police, he accelerated after an officer activated lights and sirens. Gibson's rate of speed was reportedly as high as 150 miles per hour. The government has shown by a preponderance of the evidence that Gibson presents a serious risk of flight.

## III. Assuring Gibson's Appearance

The next step for the Court is to determine whether the government has shown by a preponderance of the evidence that there is no condition or combination of conditions that will reasonably assure Gibson's appearance as required in this case. *United States v. Portes*, 786 F.2d

758, 765 (7th Cir. 1985). As discussed below, because the government has failed to meet its burden detention is not permitted under 18 U.S.C. § 3142(e).

Courts frequently use the phrase "risk of flight" while weighing the factors set forth in subsection (g) of § 3142. It is useful shorthand that is employed for good reason.[10] However, "risk of flight" is not the proper standard to apply when deciding to detain an individual. As discussed above, risk of flight or more precisely "serious risk of flight" is only what allows the government to move for detention in this case. While Congress chose to use "serious risk of flight" in subsection (f)(2)(A) to describe this limited scenario under which a defendant will face a detention hearing, Congress settled on very different language when describing the analysis courts must undertake once a detention hearing goes forward. Here, Congress did not use the term "flight" at all. Instead, it mandated that courts look to whether the government has met its burden to show that there is no condition or combination of conditions that will "reasonably assure the appearance of the person as required." 18 U.S.C. § 3142(g).

If there is a condition or combination of conditions that will reasonably ensure that Gibson will not *attempt* to flee, then the government has not met its burden, as that would assure his appearance. Given the text of the Bail Reform Act, however, the analysis cannot end there. Instead, courts must look at what conditions might reasonably assure the Court that, even if Gibson seeks to flee, he will ultimately fail. *See* H. Rep. No. 1030, 98th Cong., 2d Sess. 15 (1984), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3198 (acknowledging feasibility of conditions even "where there is a substantial risk of flight"). For that reason, courts routinely look to whether a defendant is capable of successfully fleeing the jurisdiction before discounting the availability of monitoring systems.

---

[10] Courts do not always need to parse the terms of the criminal code so closely. While the undersigned has used "risk of flight" as shorthand for the determination required under subsection (g), that shorthand is not appropriate in circumstances such as this, where courts are compelled to conduct an analysis that turns on factors not captured in that term.

*Parahams,* No. 3:13-CR-005 JD, 2013 WL 683494, at *3 (recognizing, prior to rejecting electronic monitoring as a reasonable alternative, that the defendant "may have the means to disappear"); *United States v. Anderson,* 384 F. Supp. 2d 32, 41 (D.D.C. 2005) ("Weekly or even daily call-ins or visits to Pretrial Services would still allow the defendant a day's head-start on flight from the United States. Conventional electronic monitoring also would only apprise authorities of whether Mr. Anderson was in or out of his home, and would likewise give him ample lead time if he wished to flee.").

When courts find that a defendant cannot successfully flee, they fashion conditions on release unless no conditions of release are needed. Before revoking an order of detention issued by the trial court, the D.C. Circuit Court of Appeals stressed that "the government has taken away all [the defendant's] passports and travel documents, so it is unlikely he could go far even if he wished to." *United States v. Xulam,* 84 F.3d 441, 443 (D.C. Cir. 1996). Similarly, the First Circuit Court of Appeals affirmed the release of a former federal agent who had worked abroad for five years and may have had "inside information that could assist him to escape" after discussing the effectiveness of location monitoring in apprehending those who attempt to abscond. *United States v. O'Brien,* 895 F.2d 810, 816 (1st Cir. 1990).[11]

This is not to say that the government's burden is transformed into showing that should Gibson attempt to flee the U.S. Marshal would fail to capture him. That would create such a high bar that the government may never be capable of seeking detention on such grounds. It would also omit "as required" from the court's review of whether there is a condition or combination of conditions that will "reasonably assure the appearance of [the defendant] as required." Nevertheless, it is appropriate to consider what would occur if Gibson did violate conditions of

---

[11] *O'Brien* stressed that such evidence only arguably rebutted the presumption of flight, which was present in that case. However, here the government has no such presumption.

release, such as home detention. And the Court must do so while keeping in mind that it is the government's burden to show that no condition or combination of conditions exists that will reasonably assure Gibson's presence. This inquiry stems from the text of the Bail Reform Act and also separately bears on whether Gibson would even attempt to flee in instances requiring advance planning and where he has no realistic probability of success.

This means the Court must consider what would happen if Gibson violates the terms of his release. Does he abscond to some far-off locale, or even another state? Is he the type of criminal who can slyly gather significant funds and live on the lam? The government did not delve too deeply into this area, except for some comments concerning his ability to raise funds through continued criminal activity, which is discussed in greater detail below. The government may have decided that it did not need to focus on such an analysis due to its argument regarding Gibson's danger to the community. It could also have failed to properly embrace the dual nature of its burden, that is to show both that Gibson was a risk of nonappearance *and* that there were no conditions or combinations that would reasonably assure his appearance as required. *See United States v. Sabhnani*, 493 F.3d 63, 74-75 (2d Cir. 2007) (discussing the government's "dual burden of proof" to secure detention). This finds some support in the government's multiple comments framing the issue as whether Gibson is eligible for conditions of release instead of attacking their burden to show that no conditions or combinations exist to reasonably assure appearance, which would necessarily involve some discussion, however brief, of the shortcomings in any proposed conditions.[12]

At the May 28, 2019 hearing, a United States Probation Officer took the stand to amend the previous memorandum filed after the home visit and make clear that his office felt that risk of

---

[12] The government also correctly stated its burden on many occasions.

nonappearance also remained as a factor justifying detention. Prior to this, the Court informed the parties that it felt the change was quite relevant to its earlier findings. Both the government and defense counsel had an opportunity to question the United States Probation Officer. The government questioned the United States Probation Officer about the circumstances under which the home detention might fail, asking whether the United States Probation Officer encountered any prior instances in which those on home detention left their home "to commit a crime or cut off a monitor." Leaving home detention to commit a crime goes to danger to the community, not risk of nonappearance. Perhaps the government meant to infer that cutting off the monitor leads inexorably to nonappearance, but that was not fleshed out through questioning, other evidence, or argument. Given the chance to more fully develop the record, the government did not discuss instances in which defendants placed on home monitoring have successfully fled and failed to appear as directed, or how Gibson would do so in this case. Such evidence may well exist and one could assume that defendants on home monitoring have fled from time to time, yet the Court's speculation should not fill in gaps in the government's burden of proof, especially when the government presented evidence (through its questioning) on one factor (the risk of danger to the community) and chose not to fully do so on another (the risk of nonappearance).

The government stated many times that it did not feel any conditions would assure appearance, but it never addressed specific conditions and explained how they were ineffective in reasonably assuring Gibson's appearance. Gibson will be released subject to several conditions, including a $20,000 surety posted by both Gibson and his mother. At the hearing conducted on May 28, 2019, Gibson's mother testified that if Gibson fled and was she forced to pay such a surety, that would cause her to lose her residence. Gibson was questioned and understood that any flight would have these dire consequences. Gibson's release conditions further include home

detention with location monitoring, as well as other restrictions meant to ensure that he cannot continue any criminal activity and regenerate funds that could assist in any attempts to flee.

Therefore, should Gibson violate the terms of his pretrial release, a warrant will issue shortly after he leaves his home. After that, there are a few possible outcomes. This is where Gibson's criminal history is telling. The government and defense counsel were effective advocates and set forth a reading of that criminal history that supports their respective arguments. The Court's reading is not as nuanced: if left to his own devices, for the present purposes meaning that he ignores the conditions of his release, Gibson will engage in illegal—and likely dangerous—conduct. He will get caught, as he has so often in the past, usually within or very near the Northern District of Indiana. Gibson faces a decision. He can abide by the terms of his release, or he can continue to go down a path that has seen him arrested twice in 2015, six times in 2016, three times in 2017, once in 2018, and twice already in 2019, including the instant case. The choice is his. The result is the same: he is reasonably certain to stand before the Court again prior to trial.

Of course, there are other possible scenarios if Gibson ignores the conditions of his release. There are admittedly some factors discussed in more detail below that suggest an outcome that cuts more in the government's favor. However, with the record currently before the Court, the government has failed to meet its burden.

### IV. Statutory Factors

Under § 3142(g), the Court considers several factors when determining conditions of release:

> (1) the nature and circumstance of the offense charged, including whether the offense is a crime of violence, a violation of section 1951, a Federal crime of terrorism, or involves a minor victim or a controlled substance, firearm, explosive, or destructive device;

> (2) the weight of the evidence against the person;

(3) the history and characteristics of the person, including-

> (A) his character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and

> (B) whether, at the time of the current offense or arrest, he was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and

(4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

In this case, Gibson was arrested for bank fraud and identity theft. These are not crimes of violence, but they are crimes which cause economic harm. More relevant to the Court's determination, Gibson can engage in this conduct anywhere he can connect to the internet. The fact that there is probable cause to believe Gibson committed these crimes and even lied to law enforcement supports the government's position. It weighs strongly in favor of finding that Gibson may *attempt* to violate the terms of any conditions the Court places upon him. It does not show what will happen if Gibson does so and whether conditions can reasonably assure his appearance. All devices connected to the internet, with the exception of his third party custodian's phone, which is to stay in the third party custodian's possession at all times, were removed from the home. No such devices can return to the home. The United States Probation Officer is permitted to make unannounced visits to Gibson's home. The government was unable to say whether Gibson had any funds from his criminal activity at his disposal, only that he may be able to "easily regenerate" funds. (Hr'g Tr. vol. 2, 23:25, ECF No. 18). The same is true of most anyone charged with financial crimes. Likewise, there is some mention of other participants in criminal activity, but nothing to show Gibson is still in touch with these individuals or that he will have the ability to contact them given his conditions of release. Gibson's ability to circumvent these conditions is not eliminated, but the question here is whether Gibson can commit crimes that provide him with enough money

to flee. The government has failed to meet its burden to show that there is no condition or combination of conditions that will reasonably assure Gibson cannot accumulated the funds necessary to successfully flee without authorities learning about such efforts prior to their success. The conditions imposed are designed to allow for such detection. They are not foolproof, but do provide reasonable assurance.

The government has proffered evidence of Gibson's guilt in the form of images from security cameras and data from his social media accounts, including his alleged efforts to recruit others to be a part of his scheme. The weight of the evidence is strong, which supports the government's motion for detention. Yet, that is more a question for dangerousness than risk of flight. To be sure, one can argue that stronger evidence creates a greater risk that Gibson will face incarceration, which in turn creates a greater likelihood that he will flee in order to avoid that incarceration. However, the Court's determination centers on the fact that the government has not met its burden in showing by a preponderance of the evidence that Gibson can avoid continued appearance in court, so this factor is somewhat discounted.

Gibson's history and characteristics trouble the Court, especially as they relate to failures to appear and attempts to evade or lie to law enforcement. This factor is admittedly a mixed bag. The hearing revealed that though Gibson attended some state court proceedings while he was out on bond, at other times he did not voluntarily appear and courts were required to issue warrants to secure his presence. The exact number of warrants issued is not clear. Gibson proffered a rationale for a number of his failed appearances, essentially indicating that he was unaware of the court date or that his appearance was required. The government showed that Gibson's counsel was present at those court dates and provided docket sheets to prove as much. However, this does not

completely discount Gibson's explanation, as he claims his attorney simply did not tell him about the appearances. Where the truth lies is not entirely clear.

What is clear is that the procedural differences between federal and state court may avoid a repeat scenario. With the current federal charges, Gibson will have notice of the court appearances and is assigned a United States Probation Officer. The conditions of release in no way *guarantee* that Gibson will appear in Court, but the government has not met its burden of showing by a preponderance of the evidence that there is no condition or combination of conditions that will reasonably assure his appearance. His record of appearing in state court is mixed, but there was no evidence or argument presented concerning the conditions of Gibson's previous pretrial release or how they compare to what he will now face. On the other hand, there was evidence that Gibson may have lacked notice of some earlier state court appearances, that his mother was never a third party custodian in those cases, and that there was no posting of a surety that would place Gibson's family in financial hardship should he flee. Therefore, this factor, while weighing somewhat in the government's favor is significantly discounted.

Gibson's efforts to flee from the police are yet more troubling still. They show that when he feels he may have an opportunity to avoid arrest he may unwisely take that perceived opportunity. They also show poor decision making. This bears on whether Gibson will appear as directed perhaps more than any other consideration. Yet, again, it must be discounted here where the conditions imposed present Gibson with a very different set of choices and with no evidence that he has the ability to successfully flee. It is nevertheless very concerning and raises significant public safety concerns. The notion that Gibson fled before so he will flee again is not without some pull, but a closer review shows that vastly different circumstances were present during his past decisions than those he will face on release. Here, he is not presented with a spur of the moment

decision. The second he does violate the terms of his pretrial release, he is placing his family in financial peril.

This leads to the question of Gibson's ties to the community and whether there are locations to which he will likely flee. The overwhelming majority of Gibson's arrests are within the geographical bounds of the Northern District of Indiana, with two others elsewhere in Indiana and only one out-of-state arrest. Gibson's long criminal history does not benefit his overall cause. To the contrary, it is what makes this such a close call. Nevertheless, his arrests offer a large sample size and suggest he does not routinely travel outside of the district. And, the government has not suggested that Gibson has any ability to travel internationally. Gibson has family in the Northern District of Indiana, and, while the Pretrial Services Report indicated the one of Gibson's children and the child's mother reside out of state, no evidence was introduced to suggest that he has travelled out of state to see them or that he remains in contact with them.

As detailed above, Gibson's arrest record is long. He had many pending charges at the time of his arrest and the commission of the crimes charged in the indictment. This shows both that he is a very real danger to the community *and* that he is not prone to abide by the terms of prior court orders. Again, however, the record is unclear as to how the terms of his earlier release compare with the instant conditions of release. The Court is unable to conclude that the government met its burden under these circumstances. While much of the government's evidence and argument was inarguably compelling concerning Gibson's danger to the community, the same is not true of showing that there is no condition or combination of conditions that can reasonably assure his appearance as required.

The Court is concerned with whether Gibson will take this opportunity and live by the very strict conditions he must in order to avoid violating the terms of his release. He is confined to his

home with very few exceptions, is not to drive or ride in cars other than as his mother's passenger for court appearances and medical appointments, which unless involving a medical emergency require notice to his U.S. Probation Officer. Gibson's mother is his third party custodian and surety. There are warning signs that Gibson may fail, yet these warning signs do not meet the government's burden.

It bears noting that Gibson, while presumed innocent of the pending charges against him, is likely a danger to the community. He may attempt to flee. This could result in tragic consequences. However, this Court finds that the record, the arguments presented, and the Court's independent review of the applicable legal standards in the Bail Reform Act require the Court to issue an order of release on conditions.

This decision is made without the benefit of briefing, or even the oral presentation of any case law other than that the Court brought forth. Further review is certainly not unwarranted. The government has moved to hold the Court's release order in abeyance pending review under 18 U.S.C. § 3145. This request is granted.

## CONCLUSION

Based on the foregoing, the Court hereby **DENIES** the government's oral motion to detain and **ORDERS** that Defendant Devon Gibson shall be **RELEASED** pending trial subject to the conditions set forth in the accompanying order setting conditions of release. This decision is **STAYED** pending further review by United States District Judge Philip P. Simon, pursuant to Title 18 U.S.C. § 3145.

So ORDERED this 28th day of May, 2019.

s/ Joshua P. Kolar
MAGISTRATE JUDGE JOSHUA P. KOLAR
UNITED STATES DISTRICT COURT
